# SUMMONS
## (CITATION JUDICIAL)

NOTICE TO DEFENDANT:(Aviso a Acusado)

SEE ATTACHED LIST.

YOU ARE BEING SUED BY PLAINTIFF:
(A Ud. le está demandando)

ROBERT BROWN

| | |
|---|---|
| You have *30 CALENDAR DAYS* after this Summons is served on you to file a typewritten response at this court.<br><br>A letter or phone call will not protect you; your typewritten response must be in proper legal form if you want the court to hear your case.<br><br>If you do not file your response on time, you may lose the case, and your wages, money and pro-perty may be taken without further warning from the court.<br><br>There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may call an attorney referral service or a legal aid office (listed in the phone book). | Después de que le entreguen esta citación judicial usted tiene un plazo de *30 DIAS CALENDARIOS* para presentar una respuesta escrita a máquina en esta corte.<br><br>Una carta o una llamada telefónic no le ofrecerá protección; su respuesta escrita a máquina tiene que cumplir con las formalidades legales apropiadas si usted quiere que la corte escuche su caso.<br><br>Si usted no presenta su respuesta a tiempo, puede perder el caso, y le pueden quitar su salario, su dinero y otras cosas de su propiedad sin aviso adicional por parte de la corte.<br><br>Existen otros requisitos legales. Puede que usted quiera llamar a un abogado immediatamente. Si no conoce a un abogado, puede llamar a un servicio de referencia de abogados o a una oficina de ayuda legal (vea el directorio telefónico). |

CASE NUMBER (Número del Caso)

The name and address of the court is: (El nombre y dirección de la corte es)
SAN FRANCISCO COUNTY SUPERIOR COURT
400 McAllister Street
San Francisco, CA 94102

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
(El nombre, la dirección de teléfono del abogado del demandante, o del demandante que no tien abogado, es)

DAVID R. DONADIO, ESQ., STATE BAR NO. 154436
BRAYTON✦PURCELL
222 Rush Landing Road
Novato, CA  94945-2469          (415) 898-1555

DATE: MAR 2 3 2001          Clerk, by _____, Deputy
(Fecha)                                      (Actuario)                        (Delegado)

NOTICE TO PERSON SERVED  You are served

1. ☐ as an individual defendant
2. ☐ as the person sued under the fictitious name of *(specify):*
3. ☒ on behalf of *(specify):* Honeywell International, Inc.
   under: ☒ CCP 416.10 (corporation)          ☐ CCP 416.60(minor)
              ☐ CCP 416.20 (defunct corporation)     ☐CCP 416.70 (conservatee)
              ☐ CCP 416.40 (association of partnership)  ☐ CCP 416.90 (individual)
              ☐ other:
4. ☒ by personal delivery on (date):

(See reverse for proof of Service)
SUMMONS

Form Adopted by Rule 982
Judicial Council of California
982(a)(9)(Rev January 1, 1984)

CCP 412.20
CEB

1

2

3  A.H. VOSS COMPANY
   ATLAS TURNER, INC.
4  ASBESTOS CORPORATION LIMITED
5  BELL ASBESTOS MINES LTD.
   C.C. MOORE & COMPANY ENGINEERS
6  CERTAINTEED CORPORATION
   GARLOCK, INC.
7  KUBOTA CORPORATION
   L.H. BUTCHER COMPANY
8  MacARTHUR COMPANY
   PLANT INSULATION COMPANY
9  QUIGLEY COMPANY, INC.
   QUINTEC INDUSTRIES, INC.
10 RAPID-AMERICAN CORPORATION
   REPUBLIC SUPPLY COMPANY
11 T&N PLC
   UNITED STATES GYPSUM COMPANY
12 WALDRON, DUFFY, INC.
   WESTBURNE SUPPLY, INC.
13 WESTERN MacARTHUR COMPANY
   WESTERN ASBESTOS COMPANY
14 CAPCO PIPE COMPANY, INC.
15 PNEUMO ABEX CORPORATION
   HONEYWELL INTERNATIONAL, INC.
16 THE BUDD COMPANY
   CARLISLE CORPORATION
17 DAIMLERCHRYSLER CORPORATION
   DANA CORPORATION
18 FORD MOTOR COMPANY
   BRIDGESTONE/FIRESTONE, INC.
19 GENERAL MOTORS CORPORATION
   LEAR-SIEGLER DIVERSIFIED HOLDINGS CORPORATION
20 MAREMONT CORPORATION
21 MOOG AUTOMOTIVE, INC.
   PARKER-HANNIFIN CORPORATION
22 STANDARD MOTOR PRODUCTS, INC.
   MORTON INTERNATIONAL, INC.
23 GATKE CORPORATION
   SCANDURA, INC.
24 BRASSBESTOS BRAKE LINING COMPANY
   H. KRASNE MANUFACTURING COMPANY
25 RITESET MANUFACTURING COMPANY
   AUTO SPECIALTIES, INC.
26 BORG-WARNER AUTOMOTIVE, INC.
   NISSAN NORTH AMERICA, INC.
27 PEP BOYS MANNY MOE & JACK OF CALIFORNIA
   GENUINE PARTS COMPANY
28 METROPOLITAN LIFE INSURANCE COMPANY

BRAYTON◆PURCELL
ATTORNEYS AT LAW
222 RUSH LANDING ROAD
NOVATO, CALIFORNIA 94945-2469
(415) 898-1555

1 ASBESTOS MANUFACTURING COMPANY
FIBRE & METAL PRODUCTS COMPANY
2 LASCO BRAKE PRODUCTS
L.J. MILEY COMPANY
3 ROSSENDALE-RUBOIL COMPANY
SOUTHERN FRICTION MATERIALS COMPANY
4 U.S. SPRING & BUMPER COMPANY
AUTO FRICTION CORPORATION
5 EMSCO ASBESTOS COMPANY
FORCEE MANUFACTURING CORPORATION
6 MOLDED INDUSTRIAL FRICTION CORPORATION
NATIONAL TRANSPORT SUPPLY, INC.
7 SILVER LINE PRODUCTS, INC.
STANDCO, INC.
8 UNIVERSAL FRICTION MATERIALS COMPANY
WHEELING BRAKE BLOCK MANUFACTURING COMPANY
9 ASBESTOS CLAIMS MANAGEMENT CORPORATION
and DOES 1-800,
10

11     Defendants.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28 Robert Brown vs. Asbestos Defendants (BHC)
San Francisco Superior Court

DAVID R. DONADIO, ESQ., S.B. #154436
AMY N. SIES, ESQ., S.B. #201660
BRAYTON❖PURCELL
Attorneys at Law
222 Rush Landing Road
Novato, California  94945-2469
(415) 898-1555

Attorneys for Plaintiff

**SUPERIOR COURT OF CALIFORNIA**

**COUNTY OF SAN FRANCISCO**

| | |
|---|---|
| ROBERT BROWN, | No. **319884** |
| Plaintiff, | COMPLAINT FOR PERSONAL INJURY - ASBESTOS |
| vs. | APR 1 8 2002 |
| ASBESTOS DEFENDANTS (BHC) As Reflected on Exhibits B, C, and H; and DOES 1-800. | |

1.      Plaintiff ROBERT BROWN was born May 26, 1937.

2.      Plaintiff's asbestos-related injury, date of diagnosis, employment status, and history of exposure to asbestos are as stated on Exhibit A.

3.      The Brayton Harley Curtis Master Complaint for Personal Injury [and Loss of Consortium] was filed April 9, 1996. the First Amendment to said Master Complaint was filed April 30, 1996, the Second Amendment to said Master Complaint was filed July 22, 1997, the Third Amendment to said Master Complaint was filed on October 27, 1997, the Fourth Amendment to said Master Complaint was filed on March 10, 1998, and the Fifth Amendment to said Master Complaint was filed on August 24, 1998, in San Francisco Superior Court.  A copy of the Master Complaint and General Order No. 55 may be obtained upon request from Brayton❖Purcell, and designated portions of the Master Complaint are incorporated by reference

///

BRAYTON❖PURCELL
ATTORNEYS AT LAW
222 RUSH LANDING ROAD
NOVATO, CALIFORNIA 94945
(415) 898-1555

1  herein pursuant to the authority conferred by General Order No. 55.  Plaintiff's claims are as set

2  forth in said Master Complaint against defendants herein as follows:

3

Defendants* on Exhibit:

| Cause of Action | B | B-1 | C | D | E | F | G | H |
|---|---|---|---|---|---|---|---|---|
| First (Negligence) | ☒ | ☐ | | | | | ☐ | |
| Second (Strict Liability) | ☒ | ☐ | | | | | ☐ | |
| Third (False Representation) | ☒ | ☐ | | | | | ☐ | |
| Fourth (Intentional Tort) | ☒ | | | | | | ☐ | |
| Fifth (Premises Owner/Contractor Liability) | | ☐ | ☒ | | | | | |
| Sixth, Seventh, Eighth (Unseaworthiness, Negligence [Jones Act],Maintenance and Cure) | | | | ☐ | | | | |
| Ninth (Longshore and Harbor Workers Compensation Act [LHWCA]) | | | | | ☐ | | | |
| Tenth, Eleventh (F.E.L.A.) | | | | | | ☐ | | |
| Twelfth, Thirteenth (Respiratory Safety Devices) | | | | | | | ☐ | |
| Fourteenth (Fraud and Deceit/Concealment) (see revised 14th Cause of Action below) | | | | | | | | ☒ |
| Fifteenth (Fraud and Deceit/Negligent Misrepresentation) | | | | | | | | ☐ |

20  *and their alternate entities as set forth in the Master Complaint or on any Exhibit.

21      4.    Paragraph 61 of the Fifth Cause of Action of the Master Complaint (Premises

22  Owner/Contractor Liability) is hereby amended as follows:

23      "61.   At all times mentioned herein, said Premises Owner/Contractor Liability

24  Defendants, and each of them:

25          a.  Should have recognized that the work of said contractors would create during

26  the progress of the work, dangerous, hazardous, and unsafe conditions which could or would

27  harm plaintiff and others unless special precautions were taken;

28  ///

1    b.  Knew or had reason to know, that the contractors it had selected and hired to

2  install, remove, abate or otherwise handle asbestos-containing materials were unfit or unqualified

3  to do so;

4    c.  Failed to use reasonable care to discover whether the contractors it selected and

5  hired to install, remove, abate or otherwise handle asbestos-containing materials were competent

6  or qualified to do so."

7    5.    Paragraph 64 of the Fifth Cause of Action of the Master Complaint (Premises

8  Owner/Contractor Liability) is hereby amended by adding subpart g. as follows:

9    "g.  Failure to select and hire a careful and competent contractor or

10  subcontractor."

11    6.    Defendants PARKER-HANNIFIN CORPORATION, STANDARD  MOTOR

12  PRODUCTS, INC. (E.I.S. BRAND BRAKES), GATKE CORPORATION, SCANDURA, INC.,

13  BRASSBESTOS BRAKE LINING COMPANY, H. KRASNE MANUFACTURING

14  COMPANY, RITESET MANUFACTURING COMPANY and AUTO SPECIALTIES

15  MANUFACTURING COMPANY are inserted into paragraph 14 of the Master Complaint, as

16  defendants who produced a substantial share of the market for asbestos-containing friction brake

17  products.

18    7.    Paragraph 15 of the Master Complaint is amended to add the italicized language:

19  "The aforementioned asbestos-containing brake products were toxic and carcinogenic and were

20  used in conjunction with one another, all resulting in cumulative injury and harm to the plaintiff

21  herein.  Plaintiff therefore alleges it is the burden of the defendants *as listed in paragraph 14 of*

22  *the Master Complaint*, their "alternate entities", and each of them, to prove the asbestos and

23  asbestos-containing products manufactured, sold, supplied, applied or distributed by them were

24  not the cause of plaintiff's injury in accordance with the holdings of Sindell v. Abbott

25  Laboratories (1980) 26 Cal.3d 588; Wheeler v. Raybestos-Manhattan (1992) 8 Cal.App.4th 1152

26  and Pereira v. Dow Chemical Company, Inc. (1982) 129 Cal.App.3d 865."

27  ///

28  ///

K:\CLIENTS\25543\C-PIPF.WPD

3

COMPLAINT FOR PERSONAL INJURY - ASBESTOS

1    8.    Plaintiff replaces the Fourteenth Cause of Action (paragraphs 117 through 131)

2  contained in the Fourth Amendment to Brayton Harley Curtis Master Complaint for Personal

3  Injury, with a new Fourteenth Cause of Action as follows:

4                    "FOURTEENTH CAUSE OF ACTION

5              (Intentional Tort by Means of Conspiracy/Concert of Action)

6        AS AND FOR A FURTHER, FOURTEENTH, SEPARATE AND DISTINCT CAUSE

7  OF ACTION FOR INTENTIONAL TORT BY MEANS OF CONSPIRACY/CONCERT OF

8  ACTION, PLAINTIFF COMPLAINS OF DEFENDANTS METROPOLITAN LIFE

9  INSURANCE COMPANY, GATKE CORPORATION, HONEYWELL INTERNATIONAL,

10  INC. (successor-in-interest to ALLIEDSIGNAL, INC. -- formerly known as the Bendix

11  Aviation Corporation), THE BUDD COMPANY, CARLISLE CORPORATION, CHRYSLER

12  CORPORATION (now DAIMLERCHRYSLER CORPORATION), DANA CORPORATION,

13  FORD MOTOR COMPANY, GENERAL MOTORS COMPANY,

14  BRIDGESTONE/FIRESTONE, INC., LEAR-SIEGLER, INC. (now LEAR-SIEGLER

15  DIVERSIFIED HOLDINGS CORPORATION), MAREMONT CORPORATION, MORTON-

16  THIOKOL CORPORATION  (now MORTON INTERNATIONAL, INC. ), MOOG

17  AUTOMOTIVE (formerly known as WAGNER ELECTRIC CORPORATION), PARKER-

18  HANNIFIN CORPORATION, SCANDURA, INC. (formerly known as Scandinavia Belting

19  Company), STANDARD MOTOR PRODUCTS, INC. (EIS Brand Brakes), BORG-WARNER

20  AUTOMOTIVE, INC., UNITED STATES GYPSUM COMPANY, PNEUMO ABEX

21  CORPORATION (formerly known as ABEX CORPORATION and successor-in-interest to

22  AMERICAN BRAKEBLOK CORPORATION and the S. K. WELLMAN COMPANY), and

23  T&N PLC (formerly known as TURNER AND NEWALL, alter-ego to KEASBY-MATTISON

24  COMPANY and alter-ego to S.K. WELLMAN COMPANY), ASBESTOS MANUFACTURING

25  COMPANY, BRASSBESTOS BRAKE LINING COMPANY, FIBRE & METAL PRODUCTS

26  COMPANY, H. KRASNE MANUFACTURING COMPANY, LASCO BRAKE PRODUCTS,

27  L.J. MILEY COMPANY, RITESET MANUFACTURING COMPANY, ROSSENDALE-

28  RUBOIL COMPANY, SOUTHERN FRICTION MATERIALS COMPANY, U.S. SPRING &

1  BUMPER COMPANY, AUTO FRICTION CORPORATION, AUTO SPECIALTIES

2  MANUFACTURING COMPANY, EMSCO ASBESTOS COMPANY, FORCEE

3  MANUFACTURING CORPORATION, MOLDED INDUSTRIAL FRICTION

4  CORPORATION, NATIONAL TRANSPORT SUPPLY, INC., SILVER LINE PRODUCTS,

5  INC., STANDCO, INC., UNIVERSAL FRICTION MATERIALS COMPANY, WHEELING

6  BRAKE BLOCK MANUFACTURING COMPANY, ASBESTOS CLAIMS MANAGEMENT

7  CORPORATION (formerly known as National Gypsum Company), BELL ASBESTOS MINES

8  LTD., HAYES WHEELS INTERNATIONAL COMPANY, DOES 651-675, THEIR

9  "ALTERNATE ENTITIES," AND EACH OF THEM, AND ALLEGES AS FOLLOWS:

10      117. Plaintiff, by this reference, incorporates and makes a part hereof as though fully set

11  forth herein at length each and every allegation of the First through Fourth Causes of Action as

12  though fully set forth herein.

13      118.    The term "conspirators" as used herein includes but is not limited to:  the above-

14  identified defendants, Anthony Lanza, M.D., Arthur Vorwald, M.D., Leroy Gardner, M.D.,

15  Johns-Manville, Raybestos-Manhattan (now Raymark Industries, Inc. [Raymark]), Russell

16  Manufacturing (whose liabilities have been assigned by H.K. Porter Company), Union Asbestos

17  and Rubber Company, Thermoid Company (whose assets and liabilities have been purchased by

18  H.K. Porter Company), Carey-Canada, Quebec Asbestos Corporation, Celotex Corporation,

19  Industrial Hygiene Foundation, Mellon Institute, all members of the Asbestos Textile Institute

20  [ATI], all members of the Friction Materials Standards Institute and its predecessors, and the

21  other entities and individuals identified in this Fourteenth Cause of Action.

22      119.    Plaintiff is informed and believes, and thereon alleges, that at all times herein

23  mentioned, the conspirator defendants were and are corporations organized and existing under

24  and by virtue of the laws of the State of California, or the laws of some other state or foreign

25  jurisdiction, and that defendants were and are authorized to do and/or were and are doing

26  business in the State of California, and that said defendants regularly conducted and/or conducts

27  business in the County of San Francisco, State of California.

28  ///

120.    Plaintiff was exposed to asbestos-containing dust created by the use of the asbestos products manufactured, distributed and/or supplied by one or more of the conspirators named herein.  The exposure to the asbestos or asbestos-related products supplied by the one or more of the conspirator(s) caused plaintiff's asbestos-related disease and injuries.

121.    The conspirators, individually and as agents of one another and as co-conspirators, agreed and conspired among themselves, with other asbestos manufacturers and distributors, and with certain individuals including but not limited to Anthony Lanza, M.D. (Lanza), and defendant METROPOLITAN LIFE INSURANCE COMPANY (MET LIFE) to injure the plaintiff in the following fashion (the following is not an exclusive list of the wrongful acts of the conspirators but a representative list):

(a)     Beginning in 1929, MET LIFE entered agreements with Johns-Manville and others to fund studies of the affects of asbestos exposure on Canadian asbestos miners. When the data from these studies proved that Canadian asbestos miners were developing asbestosis, MET LIFE, Johns-Manville, and others suppressed its publication; further, Anthony Lanza, M.D. (then a MET LIFE employee) actively misrepresented the results of the Canadian study for many years thereafter to meetings of health care professionals seeking information regarding asbestos exposure.

(b)     In approximately 1934, conspirators Johns-Manville and MET LIFE, through their agents, Vandiver Brown and attorney J.C. Hobart, and conspirator Raybestos-Manhattan (Raybestos), through its agents, Sumner Simpson and J. Rohrbach, suggested to Dr. Lanza, Associate Director, MET LIFE (insurers of Johns-Manville and Raybestos), that Dr. Lanza publish a study on asbestosis in which Lanza would affirmatively misrepresent material facts and conclusions about asbestos exposure; including but not limited to descriptions of the seriousness of the disease process of asbestosis.  The misrepresentation was accomplished through intentional deletion of Dr. Lanza's initial description of asbestosis as "fatal" and through other selective editing that affirmatively misrepresented asbestosis as a disease process less serious than it was known to be by the conspirators.  As a result, Lanza's study was published in the medical literature containing said misleading statements in 1935.  The conspirators were

K:\CLIENTS\21543\C-PDF.WPD
COMPLAINT FOR PERSONAL INJURY - ASBESTOS

1  motivated, in part, to effectuate this fraudulent misrepresentation and fraudulent nondisclosure

2  by the desire to influence proposed legislation to regulate asbestos exposure, to provide a defense

3  in lawsuits involving Johns-Manville, Raybestos, and MET LIFE, as insurer, and to promote the

4  use of their asbestos products.

5          (c)     The above-described conspiracy continued in 1936, when additional

6  conspirators American Brakeblok Corporation (defendant PNEUMO ABEX), defendant

7  ASBESTOS MANUFACTURING COMPANY, defendant GATKE CORPORATION, Johns-

8  Manville, Keasbey & Mattison Company (then an alter-ego to conspirator Turner & Newall,

9  defendant T&N), Raybestos-Manhattan (Raymark), Russell Manufacturing (whose liabilities

10  have been assumed by H.K. Porter Company), Union Asbestos and Rubber Company and

11  defendant USG, entered into an agreement with a leading medical research facility named

12  Saranac Laboratories.  (The following conspirators also joined the Friction Materials Standards

13  Institute portion of the conspiracy alleged below: American Brake Block Corporation (now

14  defendant PNEUMO ABEX), defendant ASBESTOS MANUFACTURING COMPANY,

15  defendant GATKE CORPORATION, Johns-Manville, Keasbey & Mattison Company (through

16  Turner & Newall (defendant T&N) alter-ego Atlas Asbestos), Raybestos-Manhattan and Russell

17  Manufacturing (whose liabilities have been assumed by H.K. Porter Company).)  Under the

18  agreement, the conspirators acquired the power to decide what information Saranac Laboratories

19  could publish regarding asbestos disease and could also control in what form such publications

20  were to occur.  Their agreement provided these conspirators the power and ability affirmatively

21  to misrepresent the results of the work at Saranac, and also gave these conspirators power to

22  suppress material facts included in any study.  On numerous occasions thereafter, the

23  conspirators exercised their power to prevent Saranac scientists from disclosing material

24  scientific data, resulting in numerous misstatements of fact regarding the health affects of

25  asbestos exposure being made at scientific meetings.

26          (d)     The conspiracy was furthered when on November 11, 1948, when

27  representatives of the following conspirators met at Johns-Manville headquarters:  Johns-

28  Manville, American Brakeblok Division of American Brake and Shoe Foundry (defendant

1  PNEUMO ABEX), defendant GATKE CORPORATION, Keasbey & Mattison Company (then

2  an alter-ego to conspirator Turner & Newall (defendant T&N)), Raybestos (now Raymark),

3  Thermoid Company (whose assets and liabilities were later purchased by H.K. Porter Company),

4  Union Asbestos and Rubber Company, defendant UNITED STATES GYPSUM COMPANY

5  and MET LIFE.  Defendant U.S. GYPSUM did not send a company employee to the meeting,

6  but instead authorized Vandiver Brown of Johns-Manville to represent its interest at the meeting

7  and to take action on its behalf.

8         (e)    At the November 11, 1948 meeting, these conspirators, and their

9  representatives, decided to exert their influence to materially alter and misrepresent material facts

10  about the substance of research conducted by Dr. Leroy Gardner at the Saranac Laboratories

11  beginning in 1936. Dr. Gardner's research involved the carcinogenicity of asbestos in mice and

12  also included an evaluation of the health effects of asbestos on humans with a critical review of

13  the then-existing standards for asbestos dust exposure.

14         (f)    At this meeting, these conspirators intentionally and affirmatively decided

15  that Dr. Gardner's work should be edited to delete material facts about the cancer-causing

16  propensity of asbestos, the health effects of asbestos on humans and the critique of the dust

17  standards.  The conspirators then published these deceptive and fraudulent statements in the

18  medical literature as edited by Dr. Arthur Vorwald, also of the Saranac Laboratories.  These

19  conspirators thereby fraudulently misrepresented the risks of asbestos exposure to the public, in

20  general, and the class of persons exposed to asbestos, including the plaintiff.

21         (g)    As a direct result of influence exerted by the conspirators, Dr. Vorwald

22  published Dr. Gardner's edited work in the Journal of Industrial Hygiene, AMA Archives of

23  Industrial Hygiene and Occupational Health in 1951 in a form that stressed those portions of Dr.

24  Garner's work that the conspirators wished stressed, but which omitted reference to human

25  asbestosis and cancer, thereby fraudulently and affirmatively misrepresenting the extent of the

26  risks. The conspirators affirmatively and deliberately disseminated this deceptive and fraudulent

27  Vorwald publication to university libraries, government officials, agencies and others.

28  ///

K:\CLIENTS25543\C-PIPF.WPD
COMPLAINT FOR PERSONAL INJURY - ASBESTOS

1    (h)    Such actions constitute a material affirmative misrepresentation of the

2  total context of material facts involved in Dr. Garner's work and resulted in creating an

3  appearance that inhalation of asbestos was less of health problem than Dr. Garner's unedited

4  work indicated.

5    (i)    When Dr. Vorwald subsequently tried to publish more complete

6  information regarding Dr. Gardner's animal studies, the conspirators required his discharge from

7  the Saranac Laboratories, denied him permission to publish or complete Gardner's work, and

8  actively discouraged institutions of higher learning from hiring or retaining Dr. Vorwald in any

9  capacity.

10    (j)    The following conspirators were members of the trade association known

11  as Quebec Asbestos Mining Association (Q.A.M.A.):  Johns-Manville Corporation, Carey-

12  Canada, individually and as successor to Quebec Asbestos Corporation, the Celotex Corporation,

13  successor to Quebec Asbestos Corporation, National Gypsum Company (now known as

14  defendant ASBESTOS CLAIMS MANAGEMENT CORPORATION), and Turner & Newall

15  (defendant T&N), individually and successor to defendant BELL ASBESTOS MINES LTD.

16  These conspirators, members of Q.A.M.A., participated in the above-described misrepresentation

17  of the work of Dr. Leroy Gardner published by Dr. Arthur Vorwald in the AMA Archives of

18  Industrial Health in 1951.  Evidence of the Q.A.M.A.'s involvement in this misrepresentation

19  arises from co-conspirator Johns-Manville's membership of the Q.A.M.A., as well as

20  correspondence from co-conspirators dated 1/29/47, 11/26/47, 3/6/48, 10/15/48, 3/8/49, and

21  9/6/50, all indicating close monitoring of the editing process of Q.A.M.A.'s representative, Ivan

22  Sabourin, acting on behalf of all Q.A.M.A. members.

23    (k)    As a furtherance of the conspiracy commenced in 1929, conspirators who

24  were members of the Q.A.M.A. as described above, began on or about 1950 to formulate a plan

25  to influence public opinion about the relationship between asbestos and cancer by influencing the

26  medical literature on this subject and then touting and disseminating this literature to the public

27  and to organizations and legislative bodies responsible for regulatory control of asbestos with the

28  ///

1  specific intent of misrepresenting the existing scientific information and suppressing contrary

2  scientific data in their possession and control.

3  (l)      This plan of misrepresentation and influence over the medical literature

4  began on or about 1950 when the aforementioned Q.A.M.A. members selected Saranac

5  Laboratories to do an evaluation of whether cancer was related to asbestos.  After a preliminary

6  report authored by Dr. Arthur Vorwald in 1952 indicated that a cancer/asbestos relationship

7  might exist in experimental animals, these Q.A.M.A. members refused to further fund the study,

8  terminated the study, and prevented any public discussion of dissemination of the results.

9  (m)      As a result of the termination of Q.A.M.A./Saranac study, the

10 conspirators fraudulently withheld information from the public and affirmatively misrepresented

11 to the public and responsible legislative and regulatory bodies that asbestos did not cause cancer,

12 including affirmative misrepresentations by conspirators and conspirators' agents K.W. Smith,

13 M.D., Paul Cartier, M.D., A.J. Vorwald, M.D., Anthony Lanza, M.D., Vandiver Brown, and Ivan

14 Sabourin, said misrepresentations being directed to inter alia, U.S. Government officials,

15 Canadian government officials, U.S. National Cancer Institute, medical organizations, health

16 professionals,  and the general public, including plaintiff.

17 (n)      Subsequently, the Q.A.M.A. conspirators contracted with the Industrial

18 Hygiene Foundation and Dr. Daniel Braun to further study the relationship between asbestos

19 exposure, asbestosis and lung cancer. In 1957, Drs. Braun and Truan (Braun and Truan) reported

20 to the Q.A.M.A. that asbestosis did increase a worker's risk of incurring lung cancer.

21 (o)      The Q.A.M.A. conspirators as a furtherance of the conspiracy commenced

22 in 1929, thereafter caused, in 1958, a publication of the work by Braun and Truan in which the

23 findings regarding increased incidence of cancer in persons with asbestosis was edited out

24 (stricken) by agents of the Q.A.M.A.  The published version of Braun/Truan study contained a

25 conclusion that asbestos exposure, alone, did not increase the incidence of lung cancer, a

26 conclusion known by the conspirators to be false.

27 (p)      By falsifying and causing publication of studies concluding that asbestos

28 exposure did not cause lung cancer and simultaneously omitting documented findings that

1   asbestosis did increase the risk of lung cancer, the conspirators affirmatively misrepresented to

2   the public and concealed from the public the extent of risks associated with inhalation of asbestos

3   fibers.

4           (q)     In furtherance of the ongoing 1929 conspiracy, in approximately 1958,

5   these Q.A.M.A. conspirators publicized the fraudulently edited works of Drs. Braun and Truan at

6   a symposium in an effort to misrepresent fraudulently to the public and persons exposed to

7   asbestos that the inhalation of asbestos dust would not cause cancer.

8           (r)     The fraudulent misrepresentations beginning in 1929 as elaborated above

9   and continuing with the publication of the 1958 Braun/Truan study influenced the standards set

10  for asbestos exposure. The developers of such standards failed to lower the maximum exposure

11  limits because a cancer risk, associated with asbestos inhalation, but had not been proven.

12          (s)     In furtherance of the 1929 conspiracy, in 1967, Q.A.M.A. conspirators

13  decided, at their trade association meeting, that they would intentionally mislead consumers

14  about the extent of risks involved in inhalation of asbestos products.

15          (t)     In furtherance of the 1929 conspiracy, in 1952, a Symposium regarding

16  the health effects of asbestos was held at the Saranac Laboratories. The following conspirators

17  were in attendance: MET LIFE, Lanza, Johns-Manville, Turner & Newall (defendant T&N),

18  Raybestos-Manhattan (now know as Raymark), and Q.A.M.A. members by way of their agents,

19  Cartier, Sabourin and LaChance.

20          (u)     At the 1952 Saranac meeting, the occurrence of lung cancer and

21  asbestosis in product users was discussed and the carcinogenic properties of all fiber types of

22  asbestos was also discussed.  In an affirmative attempt to mislead the public about the extent of

23  health risks associated with asbestos, and in an effort fraudulently to conceal those risks from the

24  pubic, these conspirators conspired to prevent publication of the record of this 1952 Saranac

25  Symposium and it was not published.  In addition, the conspirators induced Dr. Vorwald not to

26  announce the results of his and Dr. Garner's animal studies showing excess cancers in animals

27  which thereby fraudulently misrepresented existing secret data which could not be publicized

28  owing to the secrecy provisions contained in the 1936 Saranac agreement heretofore described.

1          (v)      The following conspirators were members of the trade organization

2   known as the Asbestos Textile Institute (ATI):  Raybestos (now know as Raymark), Johns-

3   Manville, H.K. Porter, Keasbey & Mattison, individually and through its alter-ego Turner &

4   Newall (defendant T&N) and National Gypsum (defendant ASBESTOS CLAIMS

5   MANAGEMENT CORPORATION), GATKE CORPORATION, individually and/or through its

6   alter-ego Asbestos Textile Company, Inc., Uniroyal, Inc., Uniroyal, Inc., individually and

7   through its alter-egos, CDU Holding Company, Uniroyal Holding Company and Uniroyal

8   Goodrich Tire Company.

9          (w)      In furtherance of the forgoing conspiracy, in 1947, these conspirators,

10  members of the ATI, received a report from industrial hygienist W.C.L. Hemeon (Hemeon)

11  regarding asbestos, which suggested re-evaluation of the then-existing maximum exposure limits

12  for asbestos exposure.  These conspirators caused the Hemeon report not to be published and

13  thereby fraudulently concealed material facts about asbestos exposure from the public and

14  affirmatively misrepresented to the public and class of persons exposed to asbestos that the then

15  existing maximum exposure limit for asbestos was acceptable.  Thereafter, these conspirators

16  withheld additional material information on the dust standards from The American Conference of

17  Governmental Industrial Hygienists (ACGIH), thereby further influencing evaluations of their

18  Threshold Limit Values for asbestos exposure.

19         (x)      In furtherance of the forgoing conspiracy, in 1953, conspirator National

20  Gypsum (defendant ASBESTOS CLAIMS MANAGEMENT CORPORATION), through its

21  agents, in response to an inquiry from the Indiana Division of Industrial Hygiene regarding

22  health hazards of asbestos spray products, refused to mail a proposed response to that division

23  indicating that respirators should be worn by applicators of the products.  National Gypsum's

24  response distorted and fraudulently misrepresented the need for applicators of asbestos spray

25  products to wear respirators and fraudulently concealed from such applicators the need for

26  respirators and thereby misrepresented the risks associated with asbestos exposure.

27         (y)      In furtherance of the forgoing conspiracy, in 1955, conspirator Johns-

28  Manville, through its agent Dr. Kenneth Smith, caused to be published in the AMA Archives of

1   Industrial Health, an article entitled "Pulmonary Disability in Asbestos Workers."  This

2   published study materially altered the results of an earlier study in 1949 concerning the same set

3   of workers.  This alteration of Dr. Smith's study constituted a fraudulent and material

4   misrepresentation about the extent of the risk associated with asbestos inhalation.

5              (z)      In furtherance of the forgoing conspiracy, in 1955, the National Cancer

6   Institute held a meeting at which conspirator Johns-Manville, individually and as an agent for

7   other co-conspirators and Dr. Vorwald, as agent of conspirators, affirmatively misrepresented

8   that there was no existing animal studies concerning the relationship between asbestos exposure

9   and cancer, when, in fact, the conspirators were in secret possession of several suppressed studies

10  which demonstrated that positive evidence did exist.

11             (aa)     In furtherance of the forgoing conspiracy, in 1957, these conspirators and

12  members of the ATI, jointly rejected a proposed research study on cancer and asbestos and this

13  resulted in fraudulently concealing from the public material facts regarding asbestos exposure

14  and also constituted an affirmative misrepresentation of the then-existing knowledge about

15  asbestos exposure and lung cancer.

16             (bb)     In furtherance of the forgoing conspiracy, in 1964, conspirators who were

17  members of the ATI met to formulate a plan for rebutting the association between lung cancer

18  and asbestos exposure that had been recently published by Dr. Irving J. Selikoff of the Mount

19  Sinai Research Center.  Thereafter, these members of the ATI embarked upon a campaign to

20  further misrepresent the association between asbestos exposure and lung cancer.

21             (cc)     Conspirator Mellon Institute and conspirator Industrial Hygiene

22  Foundation (IHF) were research institutes whose functions included involvement in research

23  regarding the health effects of inhaling asbestos dust.

24             (dd)     Beginning in the early 1940's, the IHF was involved in a study by Hemeon

25  entitled Report of Preliminary Dust Investigation for Asbestos Textile Institute, June 1947.  This

26  study was done in connection with members of the Asbestos Textile Institute (ATI).  This study

27  found that workers exposed to less than the recommended maximum exposure level for asbestos

28  ///

1    were nonetheless developing disease.  As a part of the conspiracy, the IHF never published this

2    study.

3              (ee)    Beginning in the mid 1950's, the IHF and the Mellon Institute were

4    involved in the publication of works by Braun and Truan entitled An Epidemiological Study of

5    Lung Cancer in Asbestos Miners.  In its original, unedited form in September, 1957, this study

6    had concluded that workers with asbestosis has an increased incidence of lung cancer and that the

7    Canadian government had been under-reporting cases of asbestosis.  The final, published version

8    of this study in June 1958, deleted the conclusion that workers with asbestosis suffered an

9    increased incidence of lung cancer and that the Canadian government had been under-reporting

10   asbestosis cases.  The IHF and the Mellon Institute conspired with the members of the Quebec

11   Asbestos Mining Association (Q.A.M.A.) and their legal counsel, Ivan Sabourin, and other

12   conspirators to delete the above-describe information regarding asbestos and cancer.

13             (ff)    The above-described actions of the IHF and the Mellon Institute

14   constituted intentional deception and fraud in actively misleading the public about the extent of

15   the hazards connected with breathing asbestos dust.

16             (gg)    The above-described conspiratorial and fraudulent actions of the IHF and

17   the Mellon Institute substantially contributed to retarding the development of knowledge

18   about the hazards of asbestos and thereby substantially contributed to injuries suffered by the

19   plaintiff.

20             (hh)    All conspirators identified above approved and ratified and furthered the

21   previous conspiratorial acts of conspirators Johns-Manville, Raybestos (now known as

22   Raymark), Lanza, and MET LIFE, and all the alleged co-conspirators during the date and

23   circumstances set forth above, acted as agents and co-conspirators for the other conspirators.

24             (ii)    As evidence of Raymark's fraud, concealment, suppression, and

25   conspiratorial misconduct and of the referenced conspirators, and each of them, as herein set

26   forth, Raymark's President and/or other senior executives corresponded with other senior

27   executives of Raymark's co-conspirators, which series of correspondence and related documents

28   and papers are commonly referenced as "The Sumner Simpson Papers."

1         (jj)    Further as evidence of the fraud, concealment, suppression, and

2    conspiratorial misconduct of the members of the Asbestos Textile Institute as herein set forth, the

3    ATI and the Industrial Hygiene Foundation kept minutes of their regular meetings, discussions,

4    resolutions, and related actions, recorded in "The ATI Minutes."

5         (kk)    MET LIFE was an active participant in the foregoing conspiracy and

6    benefitted thereby. MET LIFE benefitted from its involvement because of the following non-

7    exclusive list:

8              a.    by providing workers' compensation insurance to the conspirators;

9              b.    by providing life insurance for employees of the conspirators;

10             c.    by providing health insurance or health care for the employees of

11                  the conspirators;

12             d.    by providing health information and resources;

13             e.    by purchasing substantial stock in asbestos-related companies

14                  including stock of conspirators; and

15             f.    by developing information by which asbestos-related claims for

16                  compensation could be defeated.

17       122.    The foregoing conspiracy was furthered through the formation of the Friction

18   Materials Standards Institute [FMSI] and its predecessors, the Brake Lining Manufacturers'

19   Association, and the Clutch Facing and Brake Lining Standards Institute. The members thereof

20   joined with, ratified and furthered the conspiratorial actions of the above-identified conspirators.

21        (a)   (1)    The Friction Materials Standards Institute, and its predecessors, the

22   Brake Lining Manufacturers' Association, the Clutch Facing & Brake Linings Standards

23   Institute, were formed to be the ears and mouthpiece of the friction materials industry. The

24   initial members of the Friction Materials Standards Institute between 1950 and 1953 included

25   defendant ASBESTOS MANUFACTURING COMPANY, defendant T&N, PLC. (through its

26   alter-ego Atlas Asbestos Company), defendant BRASSBESTOS BRAKE LINING COMPANY,

27   defendant FIBRE & METAL PRODUCTS COMPANY, defendant GATKE CORPORATION,

28   defendant MAREMONT (through its predecessor-in-interest Grizzly Manufacturing), defendant

1  H. KRASNE MANUFACTURING COMPANY, defendant LASCO BRAKE PRODUCTS,

2  defendant HONEYWELL INTERNATIONAL, INC. (successor-in-interest to ALLIEDSIGNAL

3  INC. -- then known as Bendix Aviation Corporation), defendant L. J. MILEY COMPANY,

4  defendant CARLISLE CORPORATION, Raymark (then known as Raybestos-Manhattan),

5  defendant RITESET MANUFACTURING COMPANY, defendant ROSSENDALE-RUBOIL

6  COMPANY, defendant RUSSELL MANUFACTURING COMPANY, defendant SCANDURA

7  (then known as Scandinavian Belting Company), defendant SOUTHERN FRICTION

8  MATERIALS COMPANY, defendant U.S. SPRING & BUMPER COMPANY, defendant

9  PNEUMO ABEX (through its predecessor-in-interest, S.K. Wellman Company) and defendants

10  LEAR-SIEGLER, INC. (now LEAR-SIEGLER DIVERSIFIED HOLDINGS CORPORATION)

11  and BRIDGESTONE/FIRESTONE, INC. (through their predecessor-in-interest World Bestos

12  Corporation).  By 1973, the following joined the Friction Materials Standards Institute:

13  defendant AUTO FRICTION CORPORATION, defendant AUTO SPECIALTIES

14  MANUFACTURING COMPANY, defendant CHRYSLER CORPORATION, defendant

15  EMSCO ASBESTOS COMPANY, defendant FORCEE MANUFACTURING

16  CORPORATION, defendant GENERAL MOTORS CORPORATION, H.K. Porter Company

17  (through its Thermoid division), Johns-Manville Corporation, defendant LEAR-SIEGLER, INC.

18  (now LEAR-SIEGLER DIVERSIFIED HOLDINGS CORPORATION) (through its predecessor-

19  in-interest Royal Industries), defendant MOLDED INDUSTRIAL FRICTION CORPORATION,

20  defendant MORTON-THIOKOL (now MORTON INTERNATIONAL, INC. )(through its

21  predecessor-in-interest Thiokol Chemical Corporation), defendant NATIONAL TRANSPORT

22  SUPPLY INC., defendant PARKER-HANNIFIN CORPORATION (through its predecessor-in-

23  interest Pick Manufacturing Company), defendant PNEUMO ABEX's American Brakeblok

24  division, defendant SILVER LINE PRODUCTS INC., defendant STANDCO INC., defendant

25  UNIVERSAL FRICTION MATERIALS COMPANY, and defendant WHEELING BRAKE

26  BLOCK MANUFACTURING COMPANY.  On information and belief, plaintiff alleges that the

27  following manufacturers and/or distributors of asbestos-containing automotive friction products

28  joined with, ratified and furthered the conspiratorial actions of the above-identified conspirators,

1 including the conspirators who were members of the FMSI and its predecessors: defendant THE

2 BUDD COMPANY, defendant DANA CORPORATION, defendant FORD MOTOR

3 COMPANY, defendant GENERAL MOTORS CORPORATION, defendant LEAR-SIEGLER,

4 INC. (now LEAR-SIEGLER DIVERSIFIED HOLDINGS CORPORATION), defendant

5 MORTON-THIOKOL CORPORATION (now MORTON INTERNATIONAL, INC. ),

6 STANDARD MOTOR PRODUCTS, INC. (EIS Brand Brakes), defendant MOOG

7 AUTOMOTIVE, INC. (formerly known as Wagner Electric) and defendant BORG-WARNER.

8         (2) The Friction Materials Standards Institute conspirators lobbied the

9 Illinois Pollution Control Board to stop a proposed ban on asbestos in friction materials.

10         (3) The Friction Materials Standards Institute conspirators actively

11 lobbied and endeavored to thwart proposed OSHA regulations and actual application of the

12 regulations to the end that their asbestos-containing products could and would continue to be

13 manufactured, distributed and sold without interruption or interference.

14         (4) Even though they disseminated materials and information to the

15 contrary, The Friction Materials Standards Institute conspirators knew, and suppressed, that:

16         (i) OSHA regulations, even if enforced and complied with, would not

17         prevent asbestos disease in workers exposed to their products;

18         (ii) chrysotile asbestos caused mesothelioma and other incurable

19         disease;

20         (iii) brake workers suffered "considerable exposures" to respirable

21         asbestos fibers during the intended use, installation and expected

22         replacement of friction materials;

23         (iv) there was no "safe" level of occupational exposure to respirable

24         asbestos; and

25         (v) there was a substantial risk and danger suffered by bystanders and

26         family members of brake mechanics because of the release of respirable

27         asbestos in the use of friction materials, as herein described.

28 ///

123.   The acts and omissions of the conspirators, as described above, and each of them, constitute fraudulent concealment and/or fraudulent misrepresentation which caused injury to the plaintiff, including, but not limited to, the following manner:

(a)   The material published or caused to be published by the conspirators, was false and incomplete in that the conspirators, knowingly and deliberately deleted references to the known health hazards of asbestos and asbestos-related products.

(b)   The conspirators, with intent to defraud, individually, as members of a conspiracy, and as agents of other conspirators, intended that the publication of false and misleading reports to the general public and individuals therein, and/or the intentional suppression and nondisclosure of documented reports of health hazards of asbestos:

(1)   maintain a favorable atmosphere for the continued sale and distribution of asbestos and asbestos-related products;

(2)   assist in the continued pecuniary gain of conspirators, through the sale of their products;

(3)   influence in the conspirators' favor proposed legislation to regulate asbestos exposure and;

(4)   provide a defense in law suits brought for injury resulting from asbestos disease.

(c)   The conspirators, individually, as members of a conspiracy, and as agents of other conspirators, had a duty to disclose information regarding the health hazards of asbestos within their knowledge and/or control.  The conspirators, knowingly and intentionally breached this duty through their fraudulent concealment as described herein.

(d)   Plaintiff and others reasonably relied, both directly and indirectly, upon the published medical and scientific data documenting the purported safety of asbestos and asbestos-related products, and in the absence of published medical and scientific reports of the hazards of asbestos continued exposure to asbestos.  Plaintiff believed asbestos to be safe and was unaware of the hazards due to conspiratorial and fraudulent conduct.  Plaintiff was not warned of the hazards of asbestos dust as a direct result of the above-described conspiracy and

1  fraudulent concealment.  If plaintiff had known of the health hazards of asbestos, of which

2  plaintiff was unaware as a direct result of the conspirator's fraudulent concealment, plaintiff

3  would have acted differently regarding plaintiff's exposure to asbestos and asbestos-related

4  products.

5      (e)  Conspirators, individually, as members of a conspiracy, and as agents of

6  other conspirators, intended that plaintiff rely on the deceptive and fraudulent reports that the

7  conspiracy caused to be published throughout the United States regarding the safety of asbestos

8  and asbestos-related products and to rely on the absence of published medical and scientific data

9  (because of the conspiracy's suppression) regarding the hazards of asbestos and asbestos-related

10  products and  thereby caused plaintiff and others to continue their exposure to asbestos products.

11      (f)  Conspirators, individually, as members of a conspiracy, and as agents of

12  other conspirators were and are in a position of superior knowledge regarding the health hazards

13  of asbestos and therefore the plaintiff reasonably relied, both directly and indirectly, on the

14  published reports commissioned by the conspirators, regarding the health hazards of asbestos and

15  the absence of published information (because of the suppression by the conspiracy) regarding

16  the hazards of asbestos and asbestos-related products.

17      (g)  As a direct result of the continuing and on-going conduct of the

18  conspirators, as alleged herein, the plaintiff contracted asbestos-related disease and suffered

19  injuries and incurred damages which are described in greater detail in the forgoing Paragraphs.

20    124. MET LIFE acted in concert with the foregoing described parties (the conspirators)

21  and pursuant to a common design, as previously described, to cause injury to plaintiff.

22    125. MET LIFE knew that the conduct of Johns-Manville, Raybestos (now known as

23  Raymark), defendant USG, American Brakeblok Corporation (now defendant PNEUMO

24  ABEX), Keasbey-Mattison Company (now defendant T&N), and the other conspirators was

25  coercive, fraudulent, and deceitful towards others (including plaintiff) and that conspirators'

26  conduct was a breach of dut(y)(ies) owed plaintiff; and MET LIFE gave substantial

27  assistance and encouragement to Johns-Manville and the other conspirators in breaching their

28  duties to plaintiff and others.

1    126.    MET LIFE provided substantial assistance to the foregoing conspirators in

2    accomplishing their tortious result and their breach of duties to plaintiff.

3    127.    Plaintiff was insured, directly or indirectly, by MET LIFE and as such was owed a

4    fiduciary duty by MET LIFE which duty was breached by its foregoing conduct and conspiracy

5    which thereby caused plaintiff's asbestos-related injuries.

6    128.    The conspirators made representations to plaintiff and others concerning asbestos-

7    containing products including but not limited to:

8         (a)    the statements set forth and summarized in the foregoing paragraphs

9         (b)    that asbestos in commercially used insulation products was not hazardous

10   (this statement was known to be false by the conspirators)

11        (c)    the amount of asbestos in the air necessary to cause disease was five

12   million particles per cubic foot (this statement was known to be false by the conspirators)

13        (d)    that asbestos does not cause cancer (this statement was known to be false

14   by the conspirators);

15        (e)    in addition, the conspirators actively and fraudulently concealed facts from

16   the plaintiff and others including, but not limited to:

17             (1)    that asbestos-related disease can be a fatal disease,

18             (2)    that asbestos causes various forms of lung cancer,

19             (3)    that individuals should protect themselves from breathing asbestos

20                    dust,

21             (4)    the extent of asbestos disease in exposed populations,

22             (5)    information regarding the levels of airborne asbestos which can

23                    cause disease,

24             (6)    their experience with workers' compensation claims related to

25                    asbestos exposure,

26             (7)    the statements set forth in foregoing paragraphs.

27   129.    Further, the conspirators knew that their foregoing statements were false and that,

28   by their acts, they were actively and fraudulently concealing adverse information regarding the

K.\CLIENTS\25543\C-PDF.WPD

20

COMPLAINT FOR PERSONAL INJURY - ASBESTOS

1  health affects of asbestos including the facts set forth above; the conspirators made the false

2  statements and concealed the information with the intent to deceive; plaintiff and others relied

3  both directly and indirectly on the foregoing false statements and their lack of knowledge

4  resulting from their fraudulent concealment, resulting in and causing asbestos-related injuries and

5  damages as more fully set forth herein.

6       130.   The asbestos-containing products that conspirators manufactured, marketed,

7  distributed, sold and otherwise supplied were defective; plaintiff was exposed to asbestos

8  from the conspirators' products which caused his asbestos-related injuries as more fully set forth

9  in the foregoing paragraphs.

10       131.   Additionally and alternatively, as a direct result of MET LIFE's actions and

11  omissions, plaintiff was caused to remain ignorant of all the dangers of asbestos resulting in

12  plaintiff, his agents, employers and the general public to be aware of the true and full dangers of

13  asbestos, deprive plaintiff of the opportunity to decide for himself whether he wanted to take the

14  risk of being exposed to asbestos, denied plaintiff the opportunity to take precautions against the

15  dangers of asbestos and caused plaintiff's damages herein.

16       WHEREFORE, plaintiff prays judgment against defendants, their "alternate entities," and

17  each of them, as hereinafter set forth."

18       9.   Defendants HONEYWELL INTERNATIONAL, INC. (successor-in-interest to

19  ALLIEDSIGNAL, INC.), BORG-WARNER AUTOMOTIVE, INC., DANA CORPORATION,

20  and MOOG AUTOMOTIVE, INC. (formerly known as WAGNER ELECTRIC

21  CORPORATION) produced a substantial share of the market for asbestos-containing friction

22  clutch products, which products were defective as alleged herein, during the time in question.

23  Clutch products produced by each of said defendants were fungible, in that they were

24  interchangeable with clutch products produced by the other said defendants.  Plaintiff's primary

25  exposure to asbestos fibers from clutch products came during inspection and replacement of

26  worn clutch products, and the producers of the clutch products that caused plaintiff's injuries

27  cannot be identified through no fault of plaintiff.

28  ///

1    10.   The aforementioned asbestos-containing clutch products were toxic and

2    carcinogenic and were used in conjunction with one another, all resulting in cumulative injury

3    and harm to the plaintiff herein.  Plaintiff therefore alleges it is the burden of the defendants as

4    listed in paragraph 6 above, their "alternate entities", and each of them, to prove the asbestos and

5    asbestos-containing products manufactured, sold, supplied, applied or distributed by them were

6    not the cause of plaintiff's injury in accordance with the holdings of <u>Sindell v. Abbott</u>

7    <u>Laboratories</u> (1980) 26 Cal.3d 588; <u>Wheeler v. Raybestos-Manhattan</u> (1992) 8 Cal.App.4th 1152

8    and <u>Pereira v. Dow Chemical Company, Inc.</u> (1982) 129 Cal.App.3d 865.

9    Dated:  3\22\01                          BRAYTON✦PURCELL

10

11                                            By: _____

12                                                David R. Donadio
                                                  Attorneys for Plaintiff

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

K:\CLIENTS\25543\C-PDF.WPD                        22
COMPLAINT FOR PERSONAL INJURY - ASBESTOS

1

<u>EXHIBIT A</u>

2

3    Plaintiff's exposure to asbestos and asbestos-containing products occurred at various

4    locations both inside and outside the State of California, including but not limited to:

5
| <u>Employer</u> | Location of <u>Exposure</u> | <u>Job Title</u> | Exposure <u>Dates</u> |
|---|---|---|---|
| Gabies Café, Mission Beach, CA | Gabies Café, Mission Beach, CA | Waiter | 1951-1953 |
| Brown Packing Company, Little Rock, AR | Brown Packing Company, Little Rock, AR | Butcher | 1955-1956 |
| Brown's Farm, McGhee, AR | Brown's Farm, McGhee, AR | Farmer | 1956 |
| Conbar, San Diego, CA | Conbar, San Diego, CA | Riveter | 1957-1958 |
| Brown Packing Company, Little Rock, AR | Brown Packing Company, Little Rock, AR | Butcher | 1958-1959 |
| Unknown 3rd Street, San Diego, CA | Chemical company, 3rd Street, San Diego, CA | Truck Driver | 1959 (3-4 mos.) |
| City of San Diego Water Department, San Diego, CA | City of San Diego Water Department, San Diego, CA | Utility Worker | 1960-March 1966 |
| Brown Packing Company, Little Rock, AR | Brown Packing Company, Little Rock, AR | Butcher | 1966-1971 |
| Armour and Company, Little Rock, AR | Armour and Company, Little Rock, AR | Butcher | 1972-1974 |
| Robert Brown | Robert Brown, Little Rock, AR | Laborer | 1974-1975 |
| W.G. Brown Quarter Horse, Alexander, AR | W.G. Brown Quarter Horse, Alexander, AR | Farmer | 1975-1978 |
| Brown Musul Loading, Clinton, AR | Brown Musul Loading, Clinton, AR | Gunsmith | 1978-1981 |
| City of Clinton, Clinton Water & Sewer Department, Clinton, AR | City of Clinton, Clinton, AR | Utility Man | 1981-May 1992 |
| Basco Bolt, Little Rock AR | Basco Bolt, Little Rock AR | Shipping Clerk | 1992-7/1995 |

27    ///

28    ///

EXHIBIT A

K:\CLIENTS\23543\C-PDF.WPD
COMPLAINT FOR PERSONAL INJURY - ASBESTOS

1

**EXHIBIT A**

2   **NON-OCCUPATIONAL EXPOSURE**

3          Plaintiff currently recalls performing 20-30 brake repair jobs from 1953 to 1997. Plaintiff

4   recalls performing a few clutch repair jobs.

5          Plaintiff's exposure to asbestos and asbestos-containing products caused severe and

6   permanent injury to the plaintiff, including, but not limited to breathing difficulties, asbestosis,

7   and/or other lung damage, and increased risk and fear of developing mesothelioma, lung cancer

8   and various other cancers.  Plaintiff was diagnosed with asbestosis and asbestos-related pleural

9   disease on or about June 2000.

10          Plaintiff retired from his last place of employment as a result of becoming disabled due to

11   an injury not related to asbestos.  He has therefore suffered no disability from his asbestos-related

12   disease as "disability" is defined in California Code of Civil Procedure § 340.2.

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

EXHIBIT A

K:\CLIENTS\25543\C-PDF.WPD

24

COMPLAINT FOR PERSONAL INJURY - ASBESTOS

EXHIBIT B

DEFENDANTS

| | |
|---|---|
| A.H. VOSS COMPANY | THE BUDD COMPANY |
| ATLAS TURNER, INC. | CARLISLE CORPORATION |
| ASBESTOS CORPORATION LIMITED | DAIMLERCHRYSLER CORPORATION |
| BELL ASBESTOS MINES LTD. | DANA CORPORATION |
| C.C. MOORE & COMPANY ENGINEERS | FORD MOTOR COMPANY |
| CERTAINTEED CORPORATION | BRIDGESTONE/FIRESTONE, INC. |
| GARLOCK, INC. | GENERAL MOTORS CORPORATION |
| KUBOTA CORPORATION | LEAR-SIEGLER DIVERSIFIED HOLDINGS |
| L.H. BUTCHER COMPANY | CORPORATION |
| MacARTHUR COMPANY | MAREMONT CORPORATION |
| PLANT INSULATION COMPANY | MOOG AUTOMOTIVE, INC. |
| QUIGLEY COMPANY, INC. | PARKER-HANNIFIN CORPORATION |
| QUINTEC INDUSTRIES, INC. | STANDARD MOTOR PRODUCTS, INC. |
| RAPID-AMERICAN CORPORATION | MORTON INTERNATIONAL, INC. |
| REPUBLIC SUPPLY COMPANY | GATKE CORPORATION |
| T&N PLC | SCANDURA, INC. |
| UNITED STATES GYPSUM COMPANY | BRASSBESTOS BRAKE LINING COMPANY |
| WALDRON, DUFFY, INC. | H. KRASNE MANUFACTURING COMPANY |
| WESTBURNE SUPPLY, INC. | RITESET MANUFACTURING COMPANY |
| WESTERN MacARTHUR COMPANY | AUTO SPECIALTIES, INC. |
| WESTERN ASBESTOS COMPANY | BORG-WARNER AUTOMOTIVE, INC. |
| CAPCO PIPE COMPANY, INC. | NISSAN NORTH AMERICA, INC. |
| PNEUMO ABEX CORPORATION | PEP BOYS MANNY MOE & JACK OF CALIFORNIA |
| HONEYWELL INTERNATIONAL, INC. | GENUINE PARTS COMPANY |

ALTERNATE ENTITY

| | |
|---|---|
| C.C. MOORE & COMPANY ENGINEERS | C.C. MOORE & CO., INC. |
| CERTAINTEED CORPORATION | CERTAIN-TEED CORPORATION |
| | KEASBEY & MATTISON |
| | GUSTIN BACON MANUFACTURING CO. |
| | PARKSON PIPELINE MATERIALS |
| | PARKSON, INC. |
| | WATER CO. |
| | TELFORD SMITH SUPPLY CO. |
| KUBOTA CORPORATION | KUBOTA, LTD. |
| | KUBOTA IRON & MACHINERY WORKS, LTD. |
| L.H. BUTCHER COMPANY | CENTRAL SOLVENTS AND CHEMICAL COMPANY, INC. |
| | CHEMCENTRAL CORPORATION COMPANY, INC. |
| | HOOKER CHEMICAL CORPORATION (NY) |
| | OCCIDENTAL CHEMICAL CORPORATION |
| | UDYLITE CORPORATION (DE) |
| | UDYLITE, CALIFORNIA |
| | WILBEL, INC. |
| | WILBUR-ELLIS COMPANY |

///

EXHIBIT B

K:\CLIENTS\25543\C-PIPF.WPD
COMPLAINT FOR PERSONAL INJURY - ASBESTOS

| | | |
|---|---|---|
| 1 | | EXHIBIT B (cont'd.) |
| 2 | | ALTERNATE ENTITY |
| 3 | QUIGLEY COMPANY, INC. | QUIGLEY, INC.<br>QUIGLEY CORPORATION |
| 4 | | |
| 5 | QUINTEC INDUSTRIES, INC. | WESTERN FIBERGLAS SUPPLY COMPANY<br>MULDOON INSULATION |
| 6 | RAPID-AMERICAN CORPORATION | THE PHILIP CAREY MANUFACTURING COMPANY<br>PANACON CORPORATION |
| 7 | | PHILIP CAREY CORPORATION<br>CAREY CANADA, INC. |
| 8 | | CELOTEX CORPORATION<br>RAPID AMERICAN CORP. (DE) |
| 9 | | RAPID AMERICAN CORP. (OH)<br>RAPID ELECTROTYPE CO. |
| 10 | | FAMILY BARGAIN CENTERS, INC.<br>GLEN ALDEN COAL CO. |
| 11 | | GLEN ALDEN CORPORATION<br>KENTON CORPORATION |
| 12 | | McCORY CORPORATION<br>McGREGOR CORPORATION |
| 13 | | WORLD-WIDE FINANCIAL PARTNERSHIP, L.P.<br>RIKLIS FAMILY CORPORATION |
| 14 | | EII HOLDINGS, INC. |
| 15 | UNITED STATES GYPSUM<br>   COMPANY | SPRAYON RESEARCH CORP.<br>SMITH AND KANZLER CO., INC. |
| 16 | | SMITH AND KANZLER CORPORATION<br>SPRAYED INSULATION, INC. |
| 17 | | S.K. INSULROCK CORPORATION<br>SPRAYON RESEARCH CORPORATION |
| 18 | | SPRAYON INSULATION AND ACOUSTICS, INC.<br>SPRAYED INSULATION INC. |
| 19 | | DURABOND<br>DENEK ETERNIT FABRIK |
| 20 | | E.J. BARTELLS COMPANY<br>A.P. GREEN INDUSTRIES, INC. |
| 21 | | |
| 22 | W.R. GRACE & CO.--CONN. | HANDY DAN HOME IMPROVEMENT CENTERS, INC.<br>S & B SUPPLY CO. |
| 23 | | AEROLINE, INC.<br>ANGELS HOME IMPROVEMENT CENTER, INC. |
| 24 | | SANDY K CO. POMONA<br>DAYLIN, INC. |
| 25 | | BONANZA<br>THRIFT BUILDER SUPPLY |
| 26 | WALDRON, DUFFY, INC. | WALDRON, DUFFY & SMITH, INC. |
| 27 | /// | |
| 28 | /// | EXHIBIT B |

26

COMPLAINT FOR PERSONAL INJURY - ASBESTOS

EXHIBIT B (cont'd.)

ALTERNATE ENTITY

| | |
|---|---|
| PNEUMO ABEX CORPORATION | ABEX CORPORATION<br>AMERICAN BRAKE SHOE COMPANY<br>EATON BRAKE SHOES<br>EATON MANUFACTURING CO.<br>AMERICAN BRAKE SHOE AND FOUNDRY COMPANY<br>AMERICAN BRAKEBLOK, DIVISION OF AMERICAN<br>  BRAKE SHOE AND FOUNDRY CO.<br>AMERICAN BRAKEBLOK CORPORATION<br>AMERICAN BRAKE MATERIALS CORPORATION<br>AMERICAN BRAKE SHOE AND FOUNDRY (DE) |
| HONEYWELL INTERNATIONAL, INC. | HONEYWELL, INC.<br>ALLIEDSIGNAL, INC.<br>ALLIED-SIGNAL, INC.<br>THE BENDIX CORPORATION<br>BENDIX PRODUCTS AUTOMOTIVE DIVISION<br>BENDIX PRODUCTS DIVISION, BENDIX AVIATION CORP.<br>BENDIX HOME SYSTEMS<br>ALLIED CORPORATION<br>ALLIED CHEMICAL CORPORATION<br>GENERAL CHEMICAL CORPORATION |
| DAIMLERCHRYSLER CORPORATION | CHRYSLER CORPORATION<br>CHRYSLER MOTORS CORPORATION<br>AMERICAN MOTORS CORPORATION<br>JEEP CORPORATION<br>KAISER JEEP CORPORATION<br>WILLYS MOTORS, INC.<br>HUDSON MOTOR CAR COMPANY |
| GENERAL MOTORS CORPORATION | CHEVROLET<br>A.C. DELCO CO. |
| LEAR-SIEGLER DIVERSIFIED<br>  HOLDINGS CORPORATION | LEAR-SIEGLER, INC.<br>WORLD BESTOS CO. |
| MOOG AUTOMOTIVE, INC. | WAGNER ELECTRIC CORPORATION |
| PARKER-HANNIFIN CORPORATION | SACOMA-SIERRA, INC.<br>SACOMA MANUFACTURING COMPANY<br>E.I.S. AUTOMOTIVE CORPORATION |
| STANDARD MOTOR PRODUCTS, INC. | EIS BRAND BRAKES<br>CALI BLOCK |
| GATKE CORPORATION | ASBESTOS TEXTILE COMPANY, INC. |

///

///

EXHIBIT B

<u>EXHIBIT B (cont'd.)</u>

<u>ALTERNATE ENTITY</u>

| | |
|---|---|
| MORTON INTERNATIONAL, INC. | MORTON SALT DIVISION, MORTON<br>    INTERNATIONAL, INC.<br>MORTON THIOKOL, INC.<br>THIOKOL CORPORATION<br>THIOKOL CORPORATION, FRICTION DIVISION<br>THIOKOL CORPORATION, PANELYTE DIVISION<br>THIOKOL CHEMICAL CORPORATION |
| NISSAN NORTH AMERICA, INC. | NISSAN MOTOR CORPORATION IN U.S.A.<br>INFINITI MOTOR CORPORATION<br>DATSUN |
| GENUINE PARTS COMPANY | NAPA AUTO PARTS<br>GENUINE PARTS COMPANY OF MICHIGAN, INC.<br>AUTHORIZED MOTOR PARTS CORP.<br>GENUINE PARTS COMPANY OF WISCONSIN, INC.<br>AUTOMOTIVE PARTS COMPANY<br>COLYEAR MOTOR SALES COMPANY<br>GENERAL AUTOMOTIVE PARTS CORPORATION<br>STANDARD UNIT PARTS CORPORATION |

<u>EXHIBIT C</u>

<u>DEFENDANTS</u>

PLANT INSULATION COMPANY
WESTERN MacARTHUR COMPANY
MacARTHUR COMPANY
WESTERN ASBESTOS COMPANY

| CONTRACTOR<br><u>DEFENDANTS</u> | <u>LOCATION</u> | <u>TIME PERIOD</u> |
|---|---|---|
| PLANT INSULATION COMPANY | Various | Various |
| WESTERN MacARTHUR<br>COMPANY/MacARTHUR<br>COMPANY/WESTERN ASBESTOS<br>COMPANY | Various | Various |

EXHIBITS B, C

K:\CLIENTS\25543\C-PIPF.WPD
COMPLAINT FOR PERSONAL INJURY - ASBESTOS

1
<u>EXHIBIT H</u>

2
<u>DEFENDANTS</u>

3
METROPOLITAN LIFE INSURANCE COMPANY     RITESET MANUFACTURING COMPANY
UNITED STATES GYPSUM COMPANY            AUTO SPECIALTIES MANUFACTURING
4
PNEUMO ABEX CORPORATION                   COMPANY
T&N PLC                                 ASBESTOS MANUFACTURING COMPANY
5
BORG-WARNER AUTOMOTIVE, INC.            FIBRE & METAL PRODUCTS COMPANY
HONEYWELL INTERNATIONAL, INC. (successor-  LASCO BRAKE PRODUCTS
6
in-interest to ALLIEDSIGNAL, INC.)      L.J. MILEY COMPANY
THE BUDD COMPANY                        ROSSENDALE-RUBOIL COMPANY
7
CARLISLE CORPORATION                    SOUTHERN FRICTION MATERIALS
DAIMLERCHRYSLER CORPORATION               COMPANY
8
DANA CORPORATION                        U.S. SPRING & BUMPER COMPANY
FORD MOTOR COMPANY                      AUTO FRICTION CORPORATION
9
GENERAL MOTORS COMPANY                  EMSCO ASBESTOS COMPANY
BRIDGESTONE/FIRESTONE, INC.             FORCEE MANUFACTURING CORPORATION
10
LEAR-SIEGLER DIVERSIFIED                MOLDED INDUSTRIAL FRICTION
  HOLDINGS CORPORATION                    CORPORATION
11
MAREMONT CORPORATION                    NATIONAL TRANSPORT SUPPLY, INC.
MORTON INTERNATIONAL, INC.              SILVER LINE PRODUCTS, INC.
12
MOOG AUTOMOTIVE                         STANDCO, INC.
PARKER-HANNIFIN CORPORATION             UNIVERSAL FRICTION MATERIALS
13
STANDARD MOTOR PRODUCTS, INC.             COMPANY
GATKE CORPORATION                       WHEELING BRAKE BLOCK
14
SCANDURA, INC.                            MANUFACTURING COMPANY
BRASSBESTOS BRAKE LINING COMPANY        ASBESTOS CLAIMS MANAGEMENT
15
H. KRASNE MANUFACTURING COMPANY           CORPORATION
                                        BELL ASBESTOS MINES LTD.
16

17
<u>ALTERNATE ENTITY</u>

18
SILVER LINE PRODUCTS, INC.     SILVER LINE BRAKE CORP.

19
ASBESTOS CLAIMS MANAGEMENT      NATIONAL GYPSUM COMPANY
  CORPORATION                   GOLDBOND BUILDING PRODUCTS
20
                                PACIFIC PAPERBOARD PRODUCTS, INC.

21

22

23

24

25

26

27

28
                                                              EXHIBIT H

K:\CLIENTS\21543\C-PIPF.WPD
COMPLAINT FOR PERSONAL INJURY - ASBESTOS